BAYER AG and Bayer Corporation, Plaintiffs–Appellants,

v.

ELAN PHARMACEUTICAL RESEARCH CORPORATION and Elan Corporation, PLC, Defendants–Appellees.

No. 99–1365.

United States Court of Appeals, Federal Circuit.

May 12, 2000

Rehearing and Rehearing En Banc Denied June 22, 2000.

Rudolf E. Hutz, Connolly, Bove, Lodge & Hutz, of Wilmington, Delaware, argued for plaintiffs-appellants. With him on the brief were Jeffrey B. Bove, Mary W. Bourke, and William E. McShane.

Gary N. Frischling, Irell & Manella LLP, of Los Angeles, California, argued for defendants-appellees. With him on the

brief were Richard M. Birnholz, Flavio Rose, and Nicola J. Bird.

Before CLEVENGER, SCHALL, and BRYSON Circuit Judges.

SCHALL, Circuit Judge.

Bayer AG and Bayer Corporation (collectively, "Bayer") own United States Patent No. 5,264,446 (the "'446 patent"). The '446 patent claims a pharmaceutical composition that contains nifedipine crystals of a defined specific surface area ("SSA"). The patent also claims the composition's method of preparation and a method of treatment using the composition. Bayer sued Elan Pharmaceutical Research Corporation and Elan Corporation, PLC (collectively, "Elan") in the United States District Court for the Northern District of Georgia alleging infringement by Elan of the '446 patent. Bayer alleged infringement under 35 U.S.C. § 271(e)(2)(A)[1] based on Elan's filing of an abbreviated new drug application ("ANDA") seeking approval by the Food and Drug Administration ("FDA") of a generic version of Bayer's ADALAT CC, Bayer's commercial embodiment of the pharmaceutical composition claimed in the '446 patent. The district court granted Elan's motion for summary judgment on both literal infringement and infringement under the doctrine of equivalents and entered judgment for Elan. *See Bayer AG v. Elan Pharm. Research Corp.*, 64 F.Supp.2d 1295, 1304 (N.D.Ga.1999). We affirm.

## BACKGROUND

### A. *The ANDA Process*

As this court has described before, the Hatch–Waxman Act (the "Act") amended the Federal Food, Drug, and Cosmetic Act, Pub.L. No. 52–675, 52 Stat. 1040 (1938) (codified as amended at 21 U.S.C. §§ 301 *et. seq.*. (1994)) (the "FDCA"), as well as the patent laws. *See Bristol–Myers Squibb Co. v. Royce Lab., Inc.*, 69 F.3d 1130, 1131–32, 36 USPQ2d 1641, 1642–43 (Fed.Cir.1995); *Dupont Merck Pharm. Co. v. Bristol–Myers Squibb Co.*, 62 F.3d 1397, 1399–1401, 35 USPQ2d 1718, 1720–21 (Fed.Cir.1995). Under the FDCA, as amended by the Act, a pharmaceutical manufacturer submits an ANDA when seeking expedited FDA approval of a generic version of a drug previously approved by the FDA (a "listed drug"). *See* 21 U.S.C. § 355(j). An ANDA can be filed if the generic drug manufacturer's active ingredient is the "bioequivalent"[2] of the listed drug. *See* 21 U.S.C. § 355(j)(2)(A)(iv). When submitting an ANDA, a manufacturer must certify one of four statements concerning the applicable listed drug: (i) the listed drug is not patented (a "Paragraph I certification"); (ii) the listed drug's patent has expired (a "Paragraph II certification"); (iii) the expiration date of the listed drug's patent (a "Paragraph III certification"); or (iv) the listed drug's patent "is invalid or . . . it will not be infringed by the manufacture, use, or sale of the new drug" covered by the ANDA (a "Paragraph IV certification"). 21 U.S.C. § 355(j)(2)(A)(vii)(I)-(IV). If an ANDA is certified under Paragraph IV, the applicant must notify the patent's owner of the certification. *See* 21 U.S.C. § 355(j)(2)(B).

An ANDA certified under Paragraphs I or II is approved immediately after meet-

---

1. All statutory references are to the 1994 version of the United States Code as modified by Supplement III of 1997. All regulatory references are to the 1999 version of the Code of Federal Regulations.

2. A drug is bioequivalent to a listed drug if the extent and rate of absorption of the drug are not significantly different from that of the listed drug. *See* 21 U.S.C. § 355(j)(8)(B)(i). Alternatively, a drug is bioequivalent to a list-

ed drug if the extent of absorption is not significantly different from that of the listed drug and the drug's rate of absorption differs from that of the listed drug and the difference in the rate of absorption is intentional, is reflected in the labeling of the product, and is medically insignificant for the drug. *See* 21 U.S.C. § 355(j)(8)(B)(ii); *see also* 21 C.F.R. § 320.1(e).

ing all applicable scientific and regulatory requirements. *See* 21 U.S.C. §§ 355(j)(5)(A), (B)(i). An ANDA certified under Paragraph III must, even after meeting all applicable scientific and regulatory requirements, wait for approval until the listed drug's patent expires. *See* 21 U.S.C. §§ 355(j)(5)(A), (B)(ii). An ANDA certified under Paragraph IV is approved immediately after meeting all applicable scientific and regulatory requirements unless the listed drug's patent owner brings suit for infringement under 35 U.S.C. § 271(e)(2)(A) within forty-five days of receiving the notice required under 21 U.S.C. § 355(j)(2)(B). *See* 21 U.S.C. § 355(j)(5)(B)(iii). If suit is brought, the FDA is required to suspend approval of the ANDA, and the FDA cannot approve the ANDA until the *earliest* of three dates: (i) the date of the court's decision that the listed drug's patent is either invalid or not infringed; (ii) the date the listed drug's patent expires, *see* 35 U.S.C. § 271(e)(4)(A), if the court finds the listed drug's patent infringed; or (iii) subject to modification by the court, the date that is thirty months from the date the owner of the listed drug's patent received notice of the filing of a Paragraph IV certification. *See* 21 U.S.C. § 355(j)(5)(B)(iii)(I)-(III).

The Act modified the patent laws to provide that "[i]t shall not be an act of infringement to make, use, or sell ... a patented invention ... solely for uses reasonably related to the development and submission of information under a Federal law which regulates the manufacture, use, or sale of drugs." 35 U.S.C. § 271(e)(1). A Paragraph IV certification, however, is deemed to be an act of infringement "if the purpose of such a submission is to obtain approval under the [FDCA] to engage in the commercial manufacture, use, or sale of a drug ... claimed in a patent or the use of which is claimed in a patent before the expiration of such a patent." 35 U.S.C. § 271(e)(2)(A); *see also Glaxo, Inc.*

*v. Novopharm, Ltd.,* 110 F.3d 1562, 1567, 42 USPQ2d 1257, 1261-62 (Fed.Cir.1997). "If the court determines that the patent is not invalid and that infringement would occur, and that therefore the ANDA applicant's [P]aragraph IV certification is incorrect, the patent owner is entitled to an order that FDA approval of the ANDA containing the [P]aragraph IV certification not be effective until the patent expires." *Royce Lab.,* 69 F.3d at 1135, 36 USPQ2d at 1646 (emphasis omitted).

## B. *The '446 patent*

The application that matured into the '446 patent was filed on August 20, 1981; the '446 patent issued on November 23, 1993. The '446 patent relates to solid pharmaceutical compositions, such as tablets, that contain nifedipine crystals of a given SSA,[3] combined with a solid diluent that is adapted for formation into tablets. Nifedipine is a compound that acts on the body's circulation—a coronary vasodilator—and is used to control such medical conditions as high blood pressure. The '446 patent attempts, through its claimed SSA for nifedipine crystals, to address the problem of poor solubility—absorption of nifedipine into the blood—while still maintaining a sustained presence of nifedipine in the blood, i.e., high bioavailability. The patent seeks to achieve its objective without using such disadvantageous means as large-sized tablets, which are hard to swallow, or liquid formulations, which are very expensive and require protection from light.

The '446 patent contains twelve independent claims; the claims cover actual compositions of the nifedipine drug, methods of making the drug, and methods of treatment using the drug. Each claim specifies a SSA range for the nifedipine crystal used. Claim 1, which Bayer asserts against Elan, is representative of the com-

---

**3.** The SSA of a nifedipine crystal, and any other solid particle, is defined as the total surface area of the particle divided by the particle's weight. SSA, in the '446 patent, is measured in square meters per gram—$m^2/g$.

position claims and recites the broadest SSA range:

1. A solid pharmaceutical composition comprising as the active ingredient an effective amount of nifedipine crystals with a specific surface area of 1.0 to 4 m² /g, in admixture with a solid diluent, to result in a sustained release of nifedipine.

'446 patent, col. 5, ll. 30–34.

## C. Elan's ANDA

Elan submitted an ANDA to the FDA on April 30, 1997, seeking approval for a product that is bioequivalent to Bayer's ADALAT CC product. Elan's ANDA covers a once-daily formulation of nifedipine— an extended release tablet dosage form containing 30 mg of nifedipine. With its ANDA, Elan filed a Certificate of Quality and Analysis ("COA"). The COA related to an analysis performed by Freiberger NE–Metall GmbH ("FNM"), an independent laboratory, on April 17, 1996 with respect to the micronized—finely ground— nifedipine provided to Elan by its nifedipine supplier, Arzneimittelwerk Dresden GmbH ("AWD"). According to the COA, the measured SSA of the micronized AWD nifedipine crystals was 6.15 m²/g. The tablets made from these micronized nifedipine crystals and tested for the ANDA process are referred to by the parties as the "biobatch." Elan also filed with its ANDA a Paragraph IV certification, in which it stated that its nifedipine composition did not infringe the '446 patent or Bayer's United States Patent No. 4,892,-741 (the " '741 patent"). On July 8, 1997, Elan sent Bayer, as required by 21 U.S.C. § 505(j)(2)(B)(ii), notice of its ANDA and its Paragraph IV certification, noting that the SSA of its nifedipine was outside any of the '446 patent's claimed SSA ranges.

On March 18, 1998, Elan amended its ANDA by stating that it had revised the specification for its composition so that the composition only covered nifedipine crys-

tals of a SSA of 5 m²/g or greater. On October 23, 1998, in response to the FDA's request for Elan to define its method of testing and its testing commitment to ensure the nifedipine's SSA, Elan stated that it intended to measure the SSA of its nifedipine no more than five business days before tablet manufacture and that it would discard any nifedipine having a SSA of less than 5 m²/g.

## D. District Court Proceedings

After receiving Elan's Paragraph IV certification notice, Bayer filed suit against Elan in federal court in the Northern District of Georgia. Bayer alleged infringement, under 35 U.S.C. § 271(e)(2), of the '446 and '741 patents based on Elan's April 30, 1997 ANDA. Eventually, Bayer decided not to pursue its claim of infringement of the '741 patent. In due course, Elan moved for summary judgment of noninfringement of the '446 patent.

In ruling on Elan's motion, the district court decided that there were no genuine issues of material fact and that Elan did not infringe, either literally or under the doctrine of equivalents. See Bayer, 64 F.Supp.2d at 1301, 1304. Regarding literal infringement, the court focused on the question of whether Elan's drug, when placed on the market, would infringe the '446 patent. See id. at 1300 (citing Glaxo, 110 F.3d at 1567–68, 42 USPQ2d at 1263). The court concluded that Bayer, who bore the burden of proving infringement, had offered no evidence that Elan's drug would literally infringe the '446 patent. See Bayer, 64 F.Supp.2d at 1300. The court noted that Elan's ANDA specifies that the proposed product will have a SSA greater than 5 m²/g and that AWD, Elan's nifedipine supplier, does not sell nifedipine crystals with a SSA under 4.7 m²/g for use in the United States. See id.

Turning to infringement under the doctrine of equivalents, the court concluded that, during prosecution, Bayer[4] had sur-

4. The named inventors on the '446 patent are Ahmed Hegasy and Klaus–Dieter Rämsch.

rendered claim coverage to nifedipine crystals beyond the range of 1.0 to 4 m²/g SSA. *See id.* at 1304. In reaching this conclusion, the court examined the entire prosecution history, from August of 1981 to November of 1993, and focused on (i) Bayer's amendment changing claims 1, 2, and 3 from a SSA range of 1.0 to 6 m²/g to 1.0 to 4 m²/g and (ii) Bayer's general arguments for patentability. *See id.* at 1302–03. The court concluded that Bayer's amendment to a SSA range of 1.0 to 4 m²/g was an attempt to overcome a 35 U.S.C. § 103 obviousness rejection and that Bayer had made statements that constituted a "clear and unmistakable surrender" of subject matter outside of the claimed range of 1.0 to 4 m²/g. *Id.* at 1304.

Based upon its conclusions, the district court granted Elan's motion for summary judgment, finding Elan's Paragraph IV certification to be correct. The court therefore entered judgment in favor of Elan and dismissed Bayer's complaint. Bayer now appeals.[5] We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).

## DISCUSSION

### I.

■ Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c); *see Vivid Techs., Inc. v. American Science & Eng'g, Inc.,* 200 F.3d 795, 806–07, 53 USPQ2d 1289, 1297 (Fed.Cir.1999). We review a grant of summary judgment without deference. *See Conroy v. Reebok, Int'l, Ltd.,* 14 F.3d 1570, 1575, 29 USPQ2d 1373, 1377

(Fed.Cir.1994). In addition, we must, as the district court was required to do, draw all reasonable factual inferences in favor of the nonmovant. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Semiconductor Energy Lab. Co. v. Samsung Elecs. Co.,* 204 F.3d 1368, 1378, 54 USPQ2d 1001, 1008 (Fed.Cir. 2000).

■ Determination of a claim of infringement involves a two step inquiry. First, the claims are construed, a question of law in which the scope of the asserted claims is defined. *See Cybor Corp. v. FAS Techs., Inc.,* 138 F.3d 1448, 1454–56, 46 USPQ2d 1169, 1172–74 (Fed.Cir.1998) (en banc). Second, the claims, as construed, are compared to the accused device. *See id.* This is a question of fact. *See Insituform Techs., Inc. v. Cat Contracting, Inc.,* 161 F.3d 688, 692, 48 USPQ2d 1610, 1614 (Fed.Cir.1998) (citing *SRI Int'l v. Matsushita Elec. Corp. of Am.,* 775 F.2d 1107, 1125, 227 USPQ 577, 589 (Fed.Cir.1985) (en banc)). To prevail, the plaintiff must establish by a preponderance of the evidence that the accused device infringes one or more claims of the patent either literally or under the doctrine of equivalents. *See id.*

### II.

#### A. *Literal Infringement*

■ 1. Literal infringement requires the patentee to prove that the accused device contains each limitation of the asserted claim(s). *See Mas–Hamilton Group v. LaGard, Inc.,* 156 F.3d 1206, 1211, 48 USPQ2d 1010, 1014–15 (Fed.Cir. 1998). If any claim limitation is absent from the accused device, there is no literal infringement as a matter of law. *See id.*

---

Bayer AG is listed as the assignee of the patent. We refer to Bayer as the party prosecuting the application that matured into the '446 patent.

5. The thirty-month delay on FDA approval mandated by 21 U.S.C. § 355(j)(5)(B)(iii) has expired. At oral argument, Bayer and Elan agreed that Elan is now free to market its product. Elan has chosen to delay doing so, however, until this lawsuit is resolved.

The district court, in deciding the issue of literal infringement, first looked to Elan's ANDA, noting that it "sets a specification for its proposed product of a specific surface area greater than 5 m²/g." *Bayer,* 64 F.Supp.2d at 1300. The district court also observed that AWD, Elan's nifedipine supplier, cannot sell nifedipine with a SSA under 4.7 m²/g to anyone who will use or sell a product containing AWD's nifedipine in the United States. *See id.* In addition, the court stated that results in the COA indicated that Elan's biobatch tablets had a SSA of 6.15 m²/g. *See id.* Faced with this evidence, the court found that Bayer had offered only "unsubstantiated assertions" that there was uncertainty as to whether Elan and AWD would meet Elan's ANDA specification. Thus, Bayer had failed to meet its burden of defeating summary judgment by showing a genuine issue of material fact with respect to the issue of literal infringement of the '446 patent. *Id.* The district court concluded by noting that Bayer could sue Elan for infringement if Elan begins manufacturing for commercial sale a product with a SSA within 1.0 to 4 m²/g, as claimed by the '446 patent. *See id.* at 1301.

■ 2. Bayer's first argument on appeal is that a genuine issue of material fact exists as to whether Elan's biobatch infringes the '446 patent. Bayer contends that an infringing biobatch is material evidence of infringement under 35 U.S.C. § 271(e)(2). In that regard, Bayer asserts that there is no evidence as to the SSA of Elan's micronized nifedipine crystals just before the crystals were mixed to make biobatch tablets, and it points to certain evidence that nifedipine crystals grow over time before being mixed into tablets, thereby causing the SSA of the crystals to decrease. Bayer also argues that there are genuine issues of material fact as to whether Elan will be able to comply with its SSA specification and thus produce a noninfringing product. Bayer asserts that Elan has not specified a validated test protocol or test equipment to measure the

SSA of its nifedipine. It also asserts that Elan has not produced any samples, or test data from samples, under the requirements set forth in Elan's amended ANDA specification.

Elan responds by stating that the ANDA specification, which controls what products Elan can distribute, requires that the SSA of its nifedipine crystals be at least 5 m²/g within five days prior to the manufacturing of tablets. Elan states that the specification is binding on it, and that it could not, under its ANDA, lawfully produce a drug that does not meet the ANDA specification. Elan also states that the focus of the infringement inquiry under § 271(e)(2)(A) is not on the biobatch, but the product that will be marketed based on the ANDA specification filed with the FDA. In any event, Elan argues, there is no genuine issue of material fact as to whether its biobatch's SSA was above 4 m² /g at the time of manufacturing. According to Elan, the COA indicates that the SSA of the biobatch was 6.15 m²/g, and none of the evidence as to the rate of SSA decline presented by Bayer is a proper surrogate for the biobatch upon which Elan based its ANDA.

■ 3. We see no error in the district court's grant of summary judgment of no literal infringement in favor of Elan. Thirty-five U.S.C. § 271(e)(2)(A) provides that it shall be an act of infringement to submit an ANDA "if the purpose of such a submission is to obtain approval ... to engage in the commercial manufacture, use, or sale of a drug ... claimed in a patent or the use of which is claimed in a patent before the expiration of such patent." The focus, under § 271(e)(2)(A), is on "what the ANDA applicant will likely market if its application is approved, an act that has not yet occurred." *Glaxo,* 110 F.3d at 1569, 42 USPQ2d at 1263. "[T]his hypothetical inquiry is properly grounded in the ANDA application and the extensive materials typically submitted in its support." *Id.* Therefore, it is proper for the court to consider the ANDA itself, materials sub-

mitted by the ANDA applicant in support of the ANDA, and any other relevant evidence submitted by the applicant or patent holder. *See id.* at 1570, 110 F.3d 1562, 42 USPQ2d at 1263. However, if the ANDA "is to sell [a] well-defined compound," then the "ultimate question of infringement is usually straightforward." *Id.* at 1569, 110 F.3d 1562, 42 USPQ2d at 1263.

We believe that the specification in Elan's ANDA mandates a finding of no literal infringement. Elan's specification indicates that "the specific surface area of the micronized nifedipine is to be 5 m²/g or greater," and that this SSA "will be reflected in certification of analysis provided by Elan's supplier (AWD)." Elan further defines its specification by noting that it is "Elan's intention to measure specific surface area on the micronized Nifedipine material prior to use (within 5 working days prior to blend manufacture) to ensure that the $\geq$ 5 m²/g specification for specific surface area is met. Material not meeting this specification will not be used for manufacture." Thus, according to Elan's ANDA specification, nifedipine used in its drug cannot have a SSA of less than 5 m²/g within five working days prior to manufacturing. Significantly, Bayer does not allege that within five working days, the nifedipine's SSA will decrease from 5 m²/g to a literally infringing size of 4 m²/g or less.[6] Therefore, under the ANDA specification, Elan cannot literally infringe the '446 patent.

■ Bayer's focus on the biobatch, whose test data was submitted with Elan's ANDA, is misplaced for two reasons. First, the Act specifically provides an ANDA applicant immunity from allegations of infringement for acts that are necessary in preparing an ANDA. *See* 35 U.S.C. § 271(e)(1); *Glaxo*, 110 F.3d at 1568, 42 USPQ2d at 1262; *Royce Lab.*, 69 F.3d at 1131, 36 USPQ2d at 1643. The production of a biobatch, and the submission of a COA regarding this biobatch, are

required in the ANDA application process. *See* 21 U.S.C. § 355(j)(2)(A); 21 C.F.R. § 314.94(a)(7). Thus, even if the biobatch falls within the scope of the claims, the Act specifically indicates that such actions by Elan cannot constitute infringement. In addition, the focus of the infringement inquiry under 35 U.S.C. § 271(e)(2)(A) is on the product that will be sold after the FDA's approval of the ANDA, *see Glaxo*, 110 F.3d at 1569, 42 USPQ2d at 1263, not on the biobatch that is produced to facilitate FDA approval. The filing of an ANDA is considered an act of infringement under § 271(e)(2)(A), but this "act" is merely a vehicle "to create case or controversy jurisdiction to enable a court to promptly resolve" a dispute concerning an infringement that will happen in the future. *Glaxo*, 110 F.3d at 1569, 42 USPQ2d at 1263.

Second, the specification in Elan's ANDA defines its product in a way that directly addresses the question of infringement—the SSA of the nifedipine crystals. Elan is bound by this specification. The dispute between the parties concerns the SSA of the nifedipine that Elan will use in its drug. Elan stated to the FDA that the SSA of its nifedipine composition will not be less than 5 m²/g, clarifying in an amendment that the SSA will be 5 m²/g or more five working days before manufacturing. Elan is required, under 21 C.F.R. § 314.94(a)(9), to comply with 21 C.F.R. § 314.50(d)(1)(i) and state the ANDA drug's specification, including its particle size and the process controls used in manufacturing to assure the specification is met. Elan, in its initial ANDA and answers to FDA questions, provided this information and sought approval under 21 U.S.C. § 355(j) based on its specification.

If any of the statements in Elan's specification are false, Elan is subject to civil penalties, *see* 21 U.S.C. § 335b(a)(1), and the withdrawal of the approval of its drug,

---

6. Evidence produced by Bayer before the district court showed, at best, a decline in SSA from 5.09 m²/g to 4.91 m²/g over a six day period.

*see* 21 U.S.C. § 335c(a)(1). Additionally, if Elan introduces a drug into interstate commerce without complying with the approval requirements of 21 U.S.C. § 355, it is subject to various additional penalties, *see* 21 U.S.C. § 331(d), including an injunction, *see* 21 U.S.C. § 332(a), criminal sanctions, *see* 21 U.S.C. § 333(a), seizure of the unapproved drug, *see* 21 U.S.C. § 334(a)(1), and debarment of its corporation and individual officials from submitting or assisting in the submission of an ANDA in the future, *see* 21 U.S.C. § 335a. Elan also would be subject to criminal prosecution for making false statements to the FDA under 18 U.S.C. § 1001, conspiring to defraud the United States under 18 U.S.C. § 371, and obstructing proceedings before a federal agency under 18 U.S.C. § 1501. *See, e.g., United States v. Chatterji*, 46 F.3d 1336, 1338 (4th Cir.1995). If Elan changes its ANDA, it must file the changes with the FDA, *see* 21 C.F.R. §§ 314.97, 314.70(a), and if the changes are to the drug's specification, Elan must obtain approval for the changes before they can be made, *see* 21 C.F.R. §§ 314.97, 314.70(b)(1). In short, the only drug Elan can produce upon approval of the ANDA at issue is a drug that does not literally infringe the '446 patent.

Bayer is correct that in *Glaxo*, we approved of the district court looking to a biobatch for help in deciding the issue of infringement under 35 U.S.C. § 271(e)(2)(A). *See Glaxo*, 110 F.3d at 1569–70, 42 USPQ2d at 1262–64. However, the biobatch in *Glaxo* was properly considered because the ANDA specification in that case did not define the compound in a manner that directly addressed the issue of infringement. *See id.* The compound in *Glaxo* existed in multiple crystalline forms and mixtures, possibly containing either Form 1 or Form 2 ranitidine hydrochloride ("RHCI"), and the asserted patent covered mixtures that contained Form 2 RHCI. *See id.* at 1565–66, 110 F.3d 1562, 42 USPQ2d at 1260–61. Thus, the ANDA at issue, which permitted the marketed product to have a Form 1

RHCI purity as low as 90%, *see id.* at 1564, 110 F.3d 1562, 42 USPQ2d at 1260, did not address the question of infringement—whether a drug produced under the ANDA would contain Form 2 RHCI. Here, however, the ANDA directly addresses the question of infringement; it recites that the SSA of Elan's drug will be 5 m²/g or above. Thus, we have before us an ANDA specification that, in the words of *Glaxo*, describes a "well-defined compound," and thus "the ultimate question of infringement is ... straightforward." *Id.* at 1569, 110 F.3d 1562, 42 USPQ2d at 1263. Elan's biobatch does not control the issue of infringement.

Elan's ANDA specification requires Elan to produce a product that includes nifedipine with a SSA of 5 m²/g or above five working days prior to manufacture. Although there may be factual issues as to whether Elan can comply with its specification, they are not material factual issues because 21 U.S.C. § 331(d) prohibits Elan from selling any product that does not meet its ANDA's requirements. Thus, focusing on what the ANDA applicant will likely market under its application, Elan, under its current ANDA specification, will either market a drug with a SSA of 5 m²/g or greater five days prior to manufacture, or Elan will not, legally, market any drug under its ANDA. Finally, as discussed above, if Elan attempts to change its ANDA specification, it must pursue approval of the change(s). Thus, Bayer would be able to sue under 35 U.S.C. § 271(e)(2)(A) if any proposed change puts the drug's SSA into an infringing range, 4 m²/g or below.

B. *Infringement Under the Doctrine of Equivalents*

 1. If an asserted claim does not literally read on an accused product, infringement may still occur under the doctrine of equivalents if there is not a substantial difference between the limitations of the claim and the accused product.

*See Warner–Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 29,. 39–41, 117 S.Ct. 1040, 137 L.Ed.2d 146, 41 USPQ2d 1865, 1869, 1875–76 (1997). Infringement under the doctrine of equivalents is a question of fact. *See Insituform Techs.*, 161 F.3d at 692, 48 USPQ2d at 1614. Prosecution history estoppel is one limitation on the scope of equivalents that a patentee can claim under the doctrine of equivalents, *see Warner–Jenkinson*, 520 U.S. at 30, 117 S.Ct. 1040, 41 USPQ2d .at 1871–72, and is a question of law, *see Cybor Corp.*, 138 F.3d at 1460, 46 USPQ2d at 1178. Prosecution history estoppel can occur as a result of (i) amendments made to overcome patentability rejections or (ii) arguments made during prosecution that show "a clear and unmistakable surrender of subject matter." *Sextant Avionique, S.A. v. Analog Devices, Inc.*, 172 F.3d 817, 828 & 828 n. 3, 49 USPQ2d 1865, 1872 & 1872 n. 3 (Fed.Cir.1999); *see also Loral Fairchild Corp. v. Sony Corp.*, 181 F.3d 1313, 1322, 50 USPQ2d 1865, 1870–71 (Fed.Cir.1999).

In addressing whether there was a genuine issue of material fact as to infringement by Elan under the doctrine of equiv-alents, the district court looked to see whether prosecution history estoppel prevented Bayer from claiming a SSA beyond the upper limit of 4 m²/g set forth in claim 1 of the '446 patent. *See Bayer*, 64 F.Supp.2d at 1301. In that connection, the court examined the entire prosecution history of the '446 patent to determine what subject matter, if any, a competitor would reasonably conclude was surrendered by Bayer. *See id.* at 1301–02. The court noted that, during prosecution, Bayer argued that the SSA range of 0.5 to 6 m²/g originally claimed in claim 1 provided unexpected results, but the examiner did not

agree. *See id.* at 1302. The court further noted that, in response to the examiner's rejection of claim 1 under 35 U.S.C. § 112 and claims 1 through 4 under 35 U.S.C. § 103, Bayer amended claims 1 through 3 by changing the SSA range to 1.0 to 4 m²/g and canceled claim 4.[7] *See id.* The district court also considered declarations submitted by Bayer, as well as arguments made by Bayer's attorney, to support Bayer's claim of an unexpected, plateau-like effect for a SSA range of 1.0 to 4 m²/g, with high bioavailability dropping off outside this range. *See id.* Based on this. evidence, the district court determined, as a matter of law, that Bayer had surrendered subject matter outside the claimed range of 1.0 to 4 m²/g. *See id.* at 1304.

■ 2. Bayer argues that the amendment changing the SSA ranges in claims 1, 2, and 3 from a SSA range of 1.0 to 6 m²/g to a SSA range of 1.0 to 4 m²/g was in response to the examiner's § 112, ¶ 1 rejection, a rejection purportedly unrelated to patentability. Bayer contends that it explicitly stated, in its January 21, 1985 amendment, that the reason for the amendment was to overcome the § 112, ¶ 1 rejection. Bayer further states that the amendment did not address the obviousness rejection, which pertained to the lower end of the SSA range, where the prior art cited by the examiner only taught SSAs below 0.5 m²/g.

Bayer also contends that the district court erred in failing to address a factual question—who the "reasonable competitor" is and what a reasonable competitor would conclude from reviewing the '446 patent's prosecution history. Bayer asserts that it presented uncontroverted evidence, through the declaration of Karl F. Jorda, a professor of patent law, that a reasonable competitor would have no basis

---

7. The § 103 rejection was based on prior art that showed methods for grinding crystals to produce crystals of lower SSAs. The examiner noted that since he had raised a prima facie case of obviousness, Bayer needed to rebut with evidence to "show that 'Nifedipine crystals' of the claimed invention show unexpect-

edly superior properties of the 'Nifedipine crystals' of the prior art references." The examiner entered the § 112 rejection after determining that claim 1 lacked clear support and antecedent basis in the specification. *See* 35 U.S.C. § 112, ¶ 1.

**1252**

for concluding from the prosecution history that Bayer gave up the SSA range of 4.0 to 6 m²/g. At a minimum, Bayer contends, the Jorda declaration creates a genuine issue of material fact that precludes summary judgment.

Elan responds that, during prosecution, Bayer repeatedly represented that the SSA range of 1.0 to 4 m²/g was unique and provided unexpected results. Through declarations and attorney argument, Elan asserts, Bayer indicated that there was a special plateau effect between 1.0 to 4 m²/g and that there was a decreasing dissolution rate into the blood with nifedipine crystals with SSAs above 4 m²/g. Elan contends that Bayer, through its statements before the PTO, placed too much emphasis on the inventive nature of the SSA range of 1.0 to 4 m²/g to now be able to seek protection under the doctrine of equivalents for SSAs above 4 m²/g.

3. We need not resolve the question of why Bayer amended its claims and whether its reasons related to patentability because it is clear that, regardless of why it amended its claims, when it did so it unmistakably surrendered coverage to SSAs above 4 m²/g. As a result, it is precluded from asserting that the nifedipine composition that is the subject of Elan's ANDA infringes the '446 patent under the doctrine of equivalents. The district court did not err in granting summary judgment of no infringement under the doctrine of equivalents.

"Unmistakable assertions made by the applicant to the ... PTO ... in support of patentability, whether or not required to secure allowance of the claim, ... may operate to preclude the patentee from asserting equivalency...." *Texas Instruments Inc. v. United States Int'l Trade Comm'n,* 988 F.2d 1165, 1174, 26 USPQ2d 1018, 1025 (Fed.Cir.1993); *see also Litton Sys., Inc. v. Honeywell, Inc.,* 140 F.3d 1449, 1462, 46 USPQ2d 1321, 1327 (Fed.Cir.1998); *Coleco Indus., Inc. v. United States Int'l Trade Comm'n,* 65 C.C.P.A. 105, 573 F.2d 1247, 1256–57, 197 USPQ 472, 479–80 (1978). In determining whether there has been a clear and unmistakable surrender of subject matter, the prosecution history must be examined as a whole. *See Pharmacia & Upjohn Co. v. Mylan Pharms., Inc.,* 170 F.3d 1373, 1376, 50 USPQ2d 1033, 1036 (Fed.Cir.1999). An objective standard is applied when looking at the prosecution history, the proper inquiry being "whether a competitor would reasonably believe that the applicant had surrendered the relevant subject matter." *Cybor,* 138 F.3d at 1457, 46 USPQ2d at 1175 (citing *Insituform Techs., Inc. v. Cat Contracting, Inc.,* 99 F.3d 1098, 1107–08, 40 USPQ2d 1602, 1608 (Fed.Cir.1996)).

We conclude that a competitor looking at the prosecution history as a whole would reasonably believe that Bayer surrendered SSAs above 4 m²/g. First, before the PTO, Bayer made affirmative statements about the superiority of the 1.0 to 4 m²/g SSA range. After amending its claims to cover a SSA range of 1.0 to 4 m²/g, Bayer asserted that it claimed "a special form of nifedipine, namely, having a specific surface area of 1.0 to 4 m²/g," and it stated that 1.0 to 4 m²/g was a superior, inventive range. Thereafter, Bayer cited an article that supported the proposition that "the claimed upper limit of 4 m²/g is a reasonable upper limit for obtaining a long lasting formulation," i.e., high bioavailability. At the same time, Bayer stated, "The inventive selection of the claimed specific surface area, together with advantageous plateau activity, ... support the inventive nature of the present application." Then, in its brief to the Board of Patent Appeals and Interferences on September 26, 1986, Bayer argued that nifedipine crystals with a SSA range of 1.0 to 4 m²/g provided the "peculiar" effect of maintaining a high blood level of nifedipine for a long period of time.

Bayer also made arguments to the PTO through the declarations it filed in support of its claim of "unexpected results." In a March 24, 1985 declaration, Dr. Eduard Porges, the head of analytical activities for

one of Bayer AG's divisions, referred to "the unexpected, plateau-like effect in dissolution testing of the inventive Nifedipine crystals having a SSA of 1 to 4 m²/g." Dr. Porges concluded that a SSA range of 1.0 to 4 m²/g showed high dissolution rates, while SSAs below 1 m²/g and above 4 m²/g showed "a decreasing dissolution rate." Dr. Porges, filed another declaration on October 8, 1986 that reiterated the same finding—that a SSA range of 1.0 to 4 m²/g demonstrated a high dissolution rate, while SSAs outside that range did not. During prosecution, Bayer also submitted the declaration of Andreas Ohm, an employee in Bayer AG's Pharmaceutical Technology department. The Ohm declaration described, graphically and in text, the important plateau-like effect, noting the high percentage of nifedipine released after sixty minutes if the SSA of the nifedipine crystals was between 1.0 to 4 m²/g. Finally, in response to the examiner's last substantive rejection stating that there was insufficient data to support Bayer's assertion that a SSA range beyond 1.3 to 3.1 m²/g would function in an improved manner over the prior art, Bayer presented the declaration of Klemens Leopold Lustig, head of Bayer AG's pharmacokinetics laboratory. In his declaration, Dr. Lustig concluded that concentrations of nifedipine in blood plasma in dogs were higher when using nifedipine crystals between 0.99 to 4.05 m²/g.

In short, through its statements to the PTO and the declarations it filed, Bayer made statements of clear and unmistakable surrender of subject matter outside the claimed SSA range of 1.0 to 4 m²/g. Bayer repeatedly argued that its claimed range of 1.0 to 4 m²/g produced unique results and was a superior and inventive range. At the same time, the declarations it submitted praised the benefits of the 1.0 to 4 m²/g SSA range, claiming that this range exhibited a plateau-like effect by producing the maximum dissolution of nifedipine into the blood. Bayer also asserted that there were disadvantages to SSAs outside the claimed range. Dr.

Porges specifically stated that SSAs below 1.0 m²/g and above 4 m²/g had "a decreasing dissolution rate." All of these statements were made to further Bayer's claim that its claimed range produced unexpected results.

Statements such as Bayer's have led to "clear and unmistakable surrender" before. This case is very similar to *Pharmacia*. There, we concluded that a patentee had relinquished claim coverage to any type of lactose that was not spray-dried. *See Pharmacia*, 170 F.3d at 1376–79, 50 USPQ2d at 1037–38. During prosecution, the patentee argued that the use of spray-dried lactose was "a critical feature" of the claimed invention and that using lactose that was not spray-dried resulted in a pharmaceutical powder that was not readily processed. *Id.* at 1377, 170 F.3d 1373, 50 USPQ2d at 1037–38. We held that these statements were "reasonably interpreted as a broad disclaimer of what the invention was not." *Id.* at 1378, 170 F.3d 1373, 50 USPQ2d at 1037. Similarly, in *Texas Instruments,* an emphasis by the patentee, during prosecution, on what was termed "opposite-side gating" (placing the gate on the opposite side of the mold cavity from the semiconductor device) led to a "clear and unmistakable surrender." *Texas Instruments,* 988 F.2d at 1174–75, 26 USPQ2d at 1025–26. During prosecution, the patentee stated that placing the gate on the same side of the mold cavity, termed "same-side gating," would make its invention, covering a process for encapsulating electronic components in plastic, unworkable. *See id.* at 1174, 26 USPQ2d at 1025. The patentee also argued, in response to an obviousness rejection, that using opposite-side gating, as opposed to same-side gating, made the invention patentable. *See id.* at 1174–75, 26 USPQ2d at 1026. In view of the statements that same-side gating was disadvantageous and opposite-side gating was not taught in the prior art, we determined that Texas Instruments had given up the ability to assert that same-side gating was equivalent

to opposite-side gating. *See id.* In this case, during prosecution, Bayer emphasized the inventive nature of its claimed SSA range and the disadvantages of SSAs outside its claimed range. Thus, Bayer's statements, in total, amount to a "clear and unmistakable surrender," so that a competitor would reasonably believe that Bayer had surrendered SSAs outside the claimed range.

Finally, we must reject Bayer's argument that the declaration of Professor Jorda creates a genuine issue of material fact with respect to how a competitor would reasonably view the '446 patent's prosecution history. As noted above, Professor Jorda stated in his declaration that a reasonable competitor would have no basis for concluding, from the prosecution history, that Bayer gave up the SSA range of 4.0 to 6 $m^2/g$.

■■■ "The standard for determining whether particular subject matter was relinquished ... is an objective one which we determine as a matter of law." *Modine Mfg. Co. v. United States Int'l Trade Comm'n,* 75 F.3d 1545, 1555–56, 37 U.S.P.Q.2d 1609, 1616 (Fed.Cir.1996) (citing *LaBounty Mfg., Inc. v. United States Int'l Trade Comm'n,* 867 F.2d 1572, 1576, 9 USPQ2d 1995, 1998 (Fed.Cir.1989)). Prosecution history estoppel is a "legal matter ... guided by equitable and public policy principles underlying the doctrines involved and by the facts of the particular case." *Loctite Corp. v. Ultraseal Ltd.,* 781 F.2d 861, 871 n. 7, 228 USPQ 90, 96 n. 7 (Fed.Cir.1985), *overruled on other grounds, Nobelpharma AB v. Implant Innovations, Inc.,* 141 F.3d 1059, 46 USPQ2d 1097 (Fed.Cir.1998). One of the public policy principles underlying the doctrine is that "other players in the marketplace are entitled to rely on the record made in the Patent Office in determining the meaning and scope of the patent." *Lemelson v. General Mills, Inc.,* 968 F.2d 1202, 1208, 23 USPQ2d 1284, 1289 (Fed.Cir.1992). Having prosecution history estoppel as a purely legal issue is consistent with fostering certainty as to a patent's scope, a consideration that is important for reliance by those in the marketplace. *See, e.g., Markman v. Westview Instruments Inc.,* 517 U.S. 370, 391, 116 S.Ct. 1384, 134 L.Ed.2d 577, 38 USPQ2d 1461, 1470–71 (1996) (reasoning that allowing claim construction to be a question of law promotes both uniformity and certainty in the meaning of a patent's claims). To allow a particular part of the prosecution history estoppel inquiry (such as the matter of what a reasonable competitor would conclude was surrendered during prosecution) to be a question of fact would hamper the promotion of uniformity by binding this court to the deference required with respect to fact findings at the trial level. *See, e.g., Cybor,* 138 F.3d at 1455, 46 USPQ2d at 1173–74 (noting that if claim construction had underlying factual inquiries, the goal of national uniformity would be frustrated). Consequently, testimony as to what a reasonable competitor would conclude from the prosecution history cannot create a genuine issue of material fact so as to bar summary judgment. Such testimony is only a tool, which the judge can use at his or her discretion, to aid in the legal determination of prosecution history estoppel.

## CONCLUSION

The district court properly granted summary judgment that Elan does not literally infringe the '446 patent. The district court also properly granted summary judgment that Elan does not infringe the '446 patent under the doctrine of equivalents because during prosecution Bayer clearly and unmistakably gave up claim coverage for nifedipine crystals having SSAs greater than 4 $m^2/g$. The court's judgment in favor of Elan is therefore

AFFIRMED.