**DEERE & COMPANY, Plaintiff–Appellant,**

v.

**The TORO COMPANY, Defendant–Appellee.**

No. 02–1136.

United States Court of Appeals, Federal Circuit.

Feb. 4, 2003.

Rehearing Denied March 4, 2003.

Before RADER, SCHALL, and BRYSON, Circuit Judges.

DECISION

SCHALL, Circuit Judge.

On summary judgment, the United States District Court for the Central District of Illinois held that defendant-appellee, the Toro Company ("Toro"), did not infringe plaintiff-appellant's, Deere & Company's ("Deere's"), United States Patent No. 5,988,290 (the " '290 patent"). *Deere & Co. v. Toro Co.*, No. 99–4100, slip op. at 9 (C.D.Ill. Nov. 14, 2001). Deere now appeals the district court's grant of summary judgment of non-infringement and challenges the court's construction of the '290 patent's claims. Because we conclude that the district court erred in its claim construction, we *reverse* the grant of summary judgment and *remand* the case for further proceedings.

DISCUSSION

I.

Deere owns the '290 patent, which is entitled "Bi-directionally Biased Vertical Cultivating Machine." Cultivating ma-

chines are often used to care for turf on playing fields, where it is especially important that holes made for aeration are uniform and clean. The patented invention provides orderly movement of a cultivating tool in order to create consistent aeration holes in turf. Specifically, the patent claims an improved cultivating machine that provides more uniform cultivation through the use of a swing arm that is bi-directionally biased towards a median position.

Figure 1 of the '290 patent, shown below, illustrates a cultivating machine that incorporates a bi-directionally biased swing arm 87.

**FIG. 1**

U.S. Patent No. 5,988,290, Figure 1 (1999).

Figure 3 of the patent shows the swing arm and adjacent structures in more detail.

**FIG. 3**

U.S. Patent No. 5,988,290, Figure 3 (1999). The patented device utilizes a drive mechanism, which causes a tool support member 74 to move up and down. The tool support member, in turn, raises and lowers the cultivating tool 86 and causes a link arm 78 to rotate at pivots 80 and 83 and a swing arm 87 to rotate at pivot 89. The movement of the swing arm causes a stop mem-

ber 92 to engage either of two resilient buffer members, 90 and 91. The buffer members limit the motion of the cultivating tool by returning the swing arm to its median position.

Claim 1 is representative of the claims at issue. It recites:

> A cultivating machine comprising a structure arranged to be mounted on ground engaging wheels for movement in a line of travel, at least one tool support member mounted on the structure so as to be moveable with respect thereto, a drive mechanism operatively mounted between the structure and the at least one tool support member, the at least one tool support member comprising a body having first and second end portions, the first end portion being driven in use in a generally circular path by the drive mechanism and the second end portion being connected to the structure through a link arm pivotably attached to the at least one tool support member and to a swing arm, which in turn is pivotably attached to the structure, the swing arm being bidirectionally biased toward a median position by a biasing mechanism comprising resilient buffer members which are in contact with a stop member when the swing arm is in the median position and compressible by the stop member by movement of the swing arm from the median position whereby the buffer members apply a biasing force to urge the swing arm to the median position, the second end portion of the at least one tool support member carrying at least one cultivating tool.

U.S. Patent No. 5,988,290, col. 8, ll. 26–47 (1999) (emphasis added).

## II.

Toro manufactures and sells a cultivating machine that incorporates the Rosta Rubber Suspension system as the connection between the machine and the swing arm. The Rosta system consists of a square outer tube, a solid square pivot, and four resilient elastomers placed in the corners of the tube. The elastomers encourage the swing arm to return to its median position. The accused device is illustrated below:

Vertical movement of swing arm as a result of movable pivot (results from compression and expansion of resilient buffers)

Resilient Buffers

Pivot Axis

Swing Arm

_Fig.4_

Rotational movement of swing arm about pivot.

In December of 1999, Deere sued Toro, alleging infringement of the '290 patent. On July 11, 2001, the district court construed the claim terms, "stop member," "swing arm, which in turn is pivotably attached to the structure,"[1] and "biasing mechanism." _Deere & Co. v. Toro Co._, No. 99–4100, slip op. at 8–15 (C.D.Ill. Jul. 11, 2001). Subsequently, Deere asked the district court to reconsider its claim construction of the term "swing arm, which in turn is pivotably attached to the structure." The district court first construed the term to mean "a physical structure, a pivot, that constrains motion of an element to rotational movement in one plane." _Deere_, No. 99–4100, slip op. at 8–11 (C.D.Ill. Jul. 11, 2001). However, upon reconsideration, the court construed the term to mean "a pivot, that constrains motion of an element to rotational movement but which prevents any vertical or axial movement of the element." _Deere_, No. 99–4100, slip op. at 6 (C.D.Ill. Nov. 14, 2001) (emphasis added). The district court found a disclaimer of all vertical and axial movement in the prosecution history.

Specifically, during prosecution, the inventor's agent, William R. Evans, disclosed a previous aerator model created by the inventor, John Banks, as prior art. Banks used dampening mechanisms to control the motion of cultivating tools in his cultivating machines and to achieve the creation of clean aeration holes. His previous model, the TM 1500, utilized a swing arm embedded in a block of urethane plastic encased in a steel housing. Evans' attempts to explain the differences between the TM 1500 and the '290 invention in the prosecution history led Toro to argue, and the district court to agree, that Banks had

---

1. The district court referred to the disputed claim term as "swing arm pivotably attached to the aerator." We refer to the term as it is phrased in the patent, i.e. "swing arm, which in turn is pivotably attached to the structure."

disclaimed all motion of the swing arm in the vertical and axial directions.

The district court proceeded to grant Toro's motion for summary judgment of non-infringement because it found that there was no genuine issue of material fact. *Deere*, No. 99–4100, slip op. at 9 (C.D.Ill. Nov. 14, 2001). The court determined that the accused device permits motion in the vertical direction, and therefore could not infringe the claims as construed. *Deere*, No. 99–4100, slip op. at 9 (C.D.Ill. Nov. 14, 2001). This appeal resulted. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).

### III.

We review a grant of summary judgment by a district court *de novo*. *Cortland Line Co. v. Orvis Co.*, 203 F.3d 1351, 1355–56, 53 USPQ2d 1734, 1736 (Fed.Cir. 2000). Summary judgment is appropriate where the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. R. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In reviewing the district court's grant of Toro's motion for summary judgment, we must draw all reasonable inferences in favor of the non-movant, Deere. *See id.*

A determination of patent infringement involves a two-step analysis. "First, the court determines the scope and meaning of the patent claims asserted. [Second,] the properly construed claims are compared to the allegedly infringing device." *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1454, 46 USPQ2d 1169, 1172 (Fed.Cir. 1998) (*en banc*) (citations omitted). Step one, claim construction, is an issue of law, *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970–71, 34 USPQ2d 1321, 1322 (Fed.Cir.1995) (*en banc*), *aff'd*, 517

U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996), that we review *de novo*, *Cybor*, 138 F.3d at 1456, 46 USPQ2d at 1172. Step two, comparison of the claims to the accused device, requires the patent holder to establish that the accused device includes every claim limitation or its equivalent. *Warner–Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 29, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997). This step is a question of fact. *Bai v. L & L Wings, Inc.*, 160 F.3d 1350, 1353, 48 USQP.2d 1674, 1676 (Fed.Cir.1998). Therefore, a trial court may not resolve infringement on summary judgment unless no genuine factual issue remains. *Bell Atl. Network Servs., Inc. v. Covad Communications Group, Inc.*, 262 F.3d 1258, 1267, 59 USPQ2d 1865, 1869 (Fed.Cir.2001).

On appeal, Deere contends that Banks and his representatives distinguished the TM 1500 machine based upon the fact that it resulted in excessive vertical and oscillatory movement of the swing arm that adversely affected the uniformity of the cultivating operation. Deere challenges the district court's claim construction by arguing that, if Banks disclaimed any motion, he disclaimed excessive movement, but not small amounts of vertical and/or axial movement inherent in operation of a machine that do not affect uniform cultivation.

Toro argues that the TM 1500 allowed pivoting as well as vertical movement of the swing arm. It asserts that, during prosecution, Banks argued that the combination of vertical and rotational movement resulted in an oscillatory motion that was undesirable and that, therefore, Banks disclaimed the combination of motions.

### IV.

This appeal raises the question of the proper meaning of the phrase "swing arm, which in turn is pivotably attached to

the structure." As noted above, the district court construed the phrase to mean "a pivot, that constrains motion of an element to rotational movement but which prevents any vertical or axial movement of the element." *Deere*, No. 99–4100, slip op. at 9 (C.D.Ill. Nov. 14, 2001).

As a general rule, the words used in a claim are deemed to have their ordinary and customary meaning in their normal usage in the field of the invention. *Toro Co. v. White Consol. Indus.*, 199 F.3d 1295, 1299, 53 USPQ2d 1065, 1067 (Fed.Cir. 1999). To help inform the court of the ordinary meaning of the words, a court may consult a dictionary, encyclopedia, or treatise. *Texas Digital Sys., Inc. v. Telegenix Inc.*, 308 F.3d 1193, 1202, 64 USPQ2d 1812, 1818 (Fed.Cir.2002). Nevertheless, an inventor may act as his own lexicographer and use the specification to supply implicitly or explicitly new meanings for terms. *Markman*, 52 F.3d at 979–80, 34 USPQ2d at 1330. Thus, to help determine the proper construction of a patent claim, this court consults the claims themselves, the written description, and, if in evidence, the prosecution history. *Id.* During prosecution, an inventor may surrender coverage of material that would otherwise be covered by a claim; however, the surrender must be clear and unmistakable. *Bayer AG v. Elan Pharm. Research Corp.*, 212 F.3d 1241, 1252, 54 USPQ2d 1711, 1718 (Fed.Cir.2000) ("In determining whether there has been a clear and unmistakable surrender of subject matter, the prosecution history must be examined as a whole."). To determine whether an inventor surrendered material during prosecution history, we must determine "whether a competitor would reasonably believe that the applicant had surrendered the relevant subject matter." *Cybor*, 138 F.3d at 1457, 46 USPQ2d at 1175. Having reviewed the prosecution history, we do not think that Banks surrendered coverage of a swing arm with any vertical motion. Rather, he only disclaimed excessive vertical and oscillatory motion.[2]

We begin our analysis with the claims themselves. The plain language of claim 1 does not exclude vertical motion from the movement of the pivotally attached swing arm.[3] The term "pivotally attached" does not have a special technical meaning to one of skill in the art. *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366, 62 USPQ2d 1658, 1662 (Fed.Cir.2002) (stating that terms used in a claim bear a "heavy presumption" that they mean what they say and have the ordinary meaning that would be attributed to those words by persons skilled in the relevant art). The term "pivot," in the normal sense of the word, means "to turn about." Webster's Third New International Dictionary 1727 (1986). The dictionary definition defines pivot in terms of rotational motion, but does not explicitly exclude vertical movement. Since the patentee did not draft claim 1 to expressly disclaim vertical movement, the claim, in its face, is not so limited. We must further consult the specification and the prosecution history to determine whether the inventor limited the invention in the manner suggested.

---

**2.** Henceforth, when we refer to excessive vertical and oscillatory motion, we mean vertical and axial movement that goes beyond that amount of vertical and axial movement that is inherent in the kind of rotation in which the swing arm engages.

**3.** However, claim 9, which is nearly identical to claim 1, expressly requires that the pivoting motion of the swing arm occur about a fixed axis. There is a rebuttable presumption that differing claims are of different scope. *Kraft Foods, Inc. v. Int'l Trade Co.*, 203 F.3d 1362, 1366–67, 53 USPQ2d 1814, 1817 (Fed. Cir.2000).

The written description does not further limit the claimed term, but merely reiterates the requirement that the swing arm be pivotably attached. Additionally, the prosecution history supplied to us does not clearly and unequivocally establish that the inventor disclaimed all vertical movement of the swing arm. Rather, a competitor would reasonably believe that Banks disclaimed excessive vertical and oscillatory motion of the swing arm caused by the movement or play of the pin in the oblong hole of the TM 1500 machine.

The TM 1500 cultivating machine, which included the urethane block dampening system, is shown below:

In response to an office action of December 30, 1996 from the United States Patent & Trademark Office ("USPTO"), Evans discussed the differences between the TM 1500 machine and the purported invention.[4] His letter to the Examiner stated in relevant part as follows:

[I]n the TM–1500 machine, the end of the swing arm conrod connected to the structure in the cultivating machine was imbedded in a block of urethane plastic inside a steel housing on the structure. [...]

The urethane plastic provided **insufficient biasing** and, therefore, the swing arm **could not be pivoted** to the structure as claimed in claim 1 about an axis in a fixed position, as in claim 12. Instead, as shown in the attached sketch, the receiving holes in the steel housing had to be made **oblong to accommodate movement** of the **pivot** (not shown) of the swing (conrod) **along the axis of the oblong holes, i.e. axial movement of the swing arm.**

Referring now to Figures 3 to 6 of the application, it will be appreciated how axial movement of the swing arm 87 would change the vertical orientation of the cultivating tool 86 as well as does the

**4.** The response to the office action of December 30, 1996, dated May 30, 1997, added the claim limitation that the swing arm is bi-directionally biased, in order to overcome a rejection based on a prior art reference.

claimed pivotal rotation of the swing arm. As a result, it will also be appreciated how the **biasing forces of the TM-1500 could not be uniform because the swing arm would either first move in the oblong holes on the structure and then flex the urethane block** or vice versa. The result is that **the swing arm does not pivot** relative to the structure, as in claim 1, about a fixed axis, as in claim 12, but **rather executes an oscillatory motion**. The result is less uniform cultivating operation than the claimed invention, as would be anticipated intuitively from the **play of the pin** in the oblong hole of the structure of the TM–1500.

(emphasis added). In this response, Evans suggested that the hole through the center of the TM 1500 block was originally round to accommodate a round pin. When the swing arm failed to pivot, Banks made the hole through the center of the block oblong. The oblong hole allowed the swing arm to move vertically (called axial movement in the response) and in an oscillatory manner, leading to a change in the vertical position of the cultivating tool.[5] It is clear that Banks believed that the excessive vertical and oscillatory movement of the swing arm in the TM 1500 was undesirable, because the irregular motion of the swing arm created unclean holes. Banks, therefore, disclaimed such motion in the prosecution history. In sum, the proper construction of "swing arm, which is pivotably attached to the structure" is a swing arm that is connected to the structure in a manner so that it can rotate about the connection, but cannot move excessively in the vertical direction and cannot oscillate excessively.

After construing a patent claim, the claim must be compared with the accused device to determine if it infringes. *Warner–Jenkinson*, 520 U.S. at 29. Infringement is an issue of fact that may only be resolved through summary judgment if there is no genuine issue of material fact. *Bell Atl. Network Servs.*, 262 F.3d at 1265, 59 USPQ2d at 1869. A patent holder must establish that the accused device includes each and every claim limitation or its equivalent. *Warner–Jenkinson*, 520 U.S. at 29. The district court found that the accused device allows vertical motion, and therefore concluded that Toro was entitled to a finding of non-infringement. Since we have held that the district court erred in its claim construction, we reverse the grant of summary judgment and remand the case for a determination of infringement in light of the correct claim construction, under which there cannot be excessive movement in the vertical direction and there cannot be excessive oscillation.

---

5. The oscillatory motion likely resulted from a small amount of rotational motion in combination with the excessive vertical motion. A later preliminary amendment, dated December 9, 1997, stated with respect to the TM 1500 machine that "[t]he oblong shape of the opening allows the conrod to shift axially as well as radially." This statement suggests that the swing arm in the prior art was able to move in a radial direction, contributing to the oscillatory motion.